579 A.2d 213 (1990)
Russell L. HOLDERBAUM, Petitioner,
v.
DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS RETIREMENT AND RELIEF BOARD, Respondent.
No. 89-1384.
District of Columbia Court of Appeals.
Argued June 19, 1990.
Decided August 9, 1990.
Robert E. Deso, Washington, D.C., for petitioner.
Charlotte M. Brookins, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.
Before ROGERS, Chief Judge, and TERRY and FARRELL, Associate Judges.
FARRELL, Associate Judge:
On this petition for review of an order denying petitioner disability retirement from the Metropolitan Police Department (MPD), we conclude that a remand to the administrative board is necessary for findings concerning the statutory issue of whether petitioner was "disabled for useful and efficient service in the grade or class of position last occupied by" him. D.C. Code § 4-607(2) (1988).

*214 I.
Petitioner was appointed to the MPD in July 1968. His problems leading up to his request for disability retirement began in September 1970 when he was assaulted while on duty at RFK Stadium in Washington, D.C. After the assault he was treated for lacerations and back pain, and returned to duty. He then made repeated visits to the Police and Fire Clinic (the Clinic) complaining of severe back pain, until in October 1970 he was admitted to the Washington Hospital Center with a diagnosis of "lumbosacral strain with mild radiculitis to the left," as well as a cervical strain. He returned to full duty in 1971, but made additional visits to the Clinic complaining of pain that was classified as an exacerbation of lumbosacral strain. In February 1973 he was again admitted to the hospital for severe lower back pain, and after returning to duty in March, he was placed on sick leave for varying periods in March, May and August of 1973. In February 1974 and February 1975 he was again hospitalized with lower back pain and numbness in his right leg, resulting in a further diagnosis of exacerbation of lumbar strain with osteoarthritic changes of the lumbar spine. Through the end of 1975 he was on sick leave and was hospitalized once more, again with a diagnosis of chronic lumbar strain with degenerative arthritic changes. In February 1976 Dr. Samuel Mitchell, writing for the Board of Police and Fire Surgeons (BOS), recommended petitioner's disability retirement, but apparently the Police and Firefighters Retirement and Relief Board (Retirement Board or Board) never ruled on the recommendation.
Petitioner was terminated from the MPD in 1977 for reasons unrelated to this case. Upon his reinstatement in 1983, the BOS found him capable of performing light duty and he was given various light duty assignments. His work, which often was limited to four hours a day, remained interspersed with dozens of clinic visits and periods of sick leave. The clinic physicians, however, continued to believe that he was capable of performing light duty assignments. On June 6, 1985, a neurosurgeon, Arthur Hustead, reported that a CAT scan indicated degenerative changes throughout the lumbar spine with evidence of a herniated disc. He recommended that petitioner seek disability retirement. In August 1985 petitioner reported to the Clinic complaining of severe back pain and was placed on sick leave. He remained on sick leave until December 2, at which time he was ordered back to work after an investigation by the Casualty Branch of the MPD Internal Affairs Division (IAD).[1] In September of that year he was examined by another orthopedic surgeon, Stephen Gunther, who reported that he was suffering from "degenerative arthritis of [the] lower lumbar spine with considerable disc space narrowing at L4-5 and L5-S1." Dr. Gunther also noted that petitioner's expressions of pain were exaggerated and his responses somewhat histrionic, and expressed the opinion that he was able to perform light duty assignments as long as he was free to stand and walk around as frequently as necessary.
In 1985 petitioner became the focus of an IAD investigation. Between October 2 and November 5 he was placed under surveillance and his activities videotaped. He was observed leaving and entering his car, walking back and forth between his car and residence, and bending and carrying various objects, including fishing and archery equipment. On November 27, 1985, the BOS, after reviewing the tape and considering Dr. Gunther's report, concluded that petitioner was able to do a full tour of limited duty.
On December 9, 1986, petitioner received a notice of proposed termination for malingering and neglect of duty. An adverse action hearing was held on January 22 and February 11, 1987, before three police officials, at which the videotape was shown. Dr. Mitchell, petitioner's treating physician at the Clinic and a member of the BOS, *215 testified that the videotape showed petitioner engaged in activities he claimed he could not do. Dr. Mitchell expressed the opinion that petitioner could have performed limited duty between August and December 1985. Dr. Hustead testified that petitioner's condition had worsened since 1985 and that his symptoms fluctuated from week to week and sometimes hour to hour, but that in his opinion petitioner could perform some limited duty for four hours daily. He agreed with Dr. Gunther that petitioner sometimes exaggerated his pain, though not always. Dr. Hustead had treated petitioner seven times between 1984 and 1986.
On July 30, 1987, the adverse action panel found petitioner guilty of malingering and notified him of his termination from the police department effective August 22, 1987. The panel concluded that petitioner had feigned the degree of his disability in that "[t]he documented activities of the officer while on sick leave were equivalent to, if not beyond, the scope of those performed by limited duty personnel with similar types of injuries." Petitioner filed an appeal with the District of Columbia Office of Employee Appeals which is pending at the present time.
On August 21, 1987, the day before his termination became effective, petitioner requested that he be considered for disability retirement by the Retirement Board. The Board conducted a hearing on his retirement request on August 3, 1989.[2] It heard testimony from Dr. Lawrence A. Manning of the BOS, Captain William Freeman and Lieutenant Michael Galantetwo of petitioner's former supervisorsand petitioner himself, as well as viewing the IAD videotape. The Board concluded that petitioner had "failed to provide persuasive documented or testimonial evidence that he was disabled from performing useful and efficient service for the department before his termination.... Indeed, his outside, private physicians as well as the BOS believed he was able to perform limited duty assignments for the department." In its findings, the Board noted the determination of the police adverse action panel that petitioner had "feigned illness or disability in order to evade the performance of duty" and, "because of the question of [petitioner's] motivation," discounted the testimony of Lieutenant Galante and Captain Freeman that he had been unable to perform useful and efficient service.

II.
To receive disability retirement, an officer must show: (1) a disability, incurred in the performance of duty, (2) from useful and efficient service (3) in the grade or class of position last occupied. Szego v. Police & Firefighters Retirement & Relief Bd., 528 A.2d 1233, 1235 (D.C.1987); D.C. Code §§ 4-607(2), -616. "Implicit in these requirements is a fourth: capacity to perform the work assigned given the nature of the injury or disability." Id. The Board stipulated that any disability petitioner had incurred was sustained in the performance of duty, but found that he was not disabled from performing useful and efficient service. Petitioner argues, to the contrary, that the record "compels the finding" that he was disabled for useful and efficient service and that the Board's contrary finding is unsupported by substantial evidence. D.C.Code § 1-1510(a)(3)(E) (1987).
Petitioner's task at this stage is not an easy one. An officer seeking disability retirement "bears the burden of showing that there is no job available which he can perform in the grade or class of position he last occupied in the Department." Wells v. Police & Firefighter's Retirement & Relief Bd., 459 A.2d 136, 139 (D.C.1983) (en banc). Our standard of review of the Board's findings is deferential, "for it is not the function or authority of the reviewing court to superimpose its opinion upon the legitimate action of an administrative agency." Coakley v. Police & Firemen's Retirement & Relief Bd., 370 A.2d 1345, 1347-48 (D.C.1977). In this case, the Board *216 had before it substantial medical evidence supporting its conclusion that petitioner was able to perform limited duty for the department at the time he requested retirement.[3] We conclude, however, that it is impossible presently to review the Board's conclusion because the Board did not resolve issues critical to whether petitioner is disabled from performing useful and efficient service for the department. We must, therefore, remand the case to the agency for further proceedings. See D.C. Code § 1-1509(e) (agency "findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact").
In Wells, supra, while reaffirming that "[a] petitioner must ... establish disability from performing any job in the category [i.e., in his grade or class] before qualifying for retirement," 459 A.2d at 138, quoting Seabolt v. Police & Firemen's Retirement & Relief Bd., 413 A.2d 908, 912 (D.C.1980), we explained that "[a] petitioner will be able to show that no appropriate job is available if the Department fails to place and keep him employed in such a job." Id. 459 A.2d at 139. We noted that "[t]he presumption that a suitable light duty position exists can be rebutted either at the original hearing, or later if no position that the injured officer can perform is available in the grade or class he last occupied." Id. at 139 n. 3. Wells thus acknowledged that a partially disabled employee can "make a prima facie case, by reference to his or her own workload, that no `useful and efficient' work exists for one with his or her disability." Martin, supra note 3, 532 A.2d at 108 (opinion of Ferren, J.). The petitioner must come forward with evidence that the duties assigned him are not useful or efficient service, and provided he does, the burden shifts to the department to adduce evidence to the contrary. See id. at 117 (Rogers, J., dissenting) ("Since Martin failed to shift the burden of coming forward with evidence, the Board could properly defer to the police department's determination that Martin's limited duty job provides useful and efficient service") (footnote omitted).
In the case at bar, petitioner attempted to rebut the presumption that he was given useful and efficient work by presenting testimony from Captain Freeman and Lieutenant Galante about his duties during the relevant time period. Galante, who had supervised him for a period of months before his August 1987 termination, insisted that although "an honest attempt [had been] made to utilize his time as productively for the department as possible," petitioner was "not really needed in my office" and did not perform any work that was not already being performed by others before he was transferred there. Captain Freeman, who had supervised petitioner for a longer period in 1983-85, recalled that, in view of petitioner's complaints of pain (which Freeman became convinced were genuine), "there was nothing [for him] to do. We'd just put him in a *217 corner some place.... The work was meaningless.... It was giving [petitioner] something to do. That's what it boiled down to." No one else testified as to petitioner's actual duties.
The Board made no finding whether this evidence was sufficient to rebut "[t]he presumption that a suitable light duty position exists," Wells, supra, 459 A.2d at 139 n. 3, and thus whether the department was required to come forward with evidence to the contrary. Although the Board took note of the testimony of Freeman and Galante, it dismissed this testimony with the cryptic observation: "The Board gives little weight to the non-medical testimony, because of the question of motivation." The Board undoubtedly was referring to the finding of the adverse action panel that petitioner had been malingering or feigning disability to evade the performance of duty. The Board therefore looked instead, and gave "particular weight," to the combined "medical documented evidence of record" that petitioner, "even with his chronic complaints of periodic pain, [was able] to perform useful and efficient service in a limited duty status for the department, despite his lack of motivation and interest right up to the day he was terminated ..." (emphasis added). The Board, in other words, apparently reasoned that a showing by petitioner that the department "fail[ed] to place and keep him employed in [an appropriate] job" and hence that none was available, Wells, 459 A.2d at 139, was beside the point since petitioner was not genuinely disabled from performing the normal work given a healthy officer in his position.
If petitioner was feigning disability, it would indeed have been irrelevant that only useless and inefficient work could be assigned him as a result. The Wells presumption cannot be defeated by a sham incapacity to perform useful work. The premise for this conclusion, however, is that petitioner in fact was not disabled but only pretending to be so. And what is lacking in the Board's opinion is anything approaching an express determination that petitioner met this description.
As pointed out, the Board took note of the result of the adverse action proceeding and essentially discounted the testimony of petitioner's police supervisors about the work given to him, "because of the question of motivation." A "question" or doubt about the legitimacy of petitioner's claimed disability is not a substitute for a finding that he was not genuinely disabled. To avoid coming to grips with Lieutenant Galante's and Captain Freeman's testimony which at least tended to show that petitioner was not being given useful and efficient workthe Board needs to deal forthrightly with the issue of whether he was truly disabled or malingering. Anything less, moreover, would be unfair to petitioner given his stake in the outcome of the proceeding. Accordingly, we must remand the case to the Board for express findings on this issue.
Significantly, the almost identical issue is pending before the District of Columbia Office of Employee Appeals on petitioner's appeal from his 1987 termination on grounds of malingering. Although that action was based upon his conduct while on sick leave from August to December 1985, the outcome of the appeal will have undeniable relevance to an evaluation of petitioner's conduct during the ensuing year and a half. The Board therefore may wish to hold petitioner's request for disability retirement in abeyance pending decision in that matter. However, we do not dictate the course of further proceedings before the Board; we hold only that it may not dispense with a finding whether petitioner had made the showing required by Wells unless it finds expressly that he was not genuinely disabled from limited duty during the relevant period before his termination.[4]See Proulx v. Police & Firemen's Retirement & Relief Bd., 430 A.2d 34 (D.C. 1981) (Board found expressly that petitioner could "perform service more than his own testimony would indicate" and that "his failure to do so was due to his own *218 motivation and not because he was unable to do so").
Order vacated and case remanded for further proceedings consistent with this opinion.
NOTES
[1] Between August and December of 1985 petitioner made approximately eleven visits to the Clinic and each time was kept on sick leave. After his return, he continued to perform light duty interspersed with periods of sick leave. This pattern continued until his termination on August 22, 1987.
[2] The Board initially refused to hear the request since petitioner was no longer a member of the department. D.C.Code § 4-607(1) (1988). Petitioner then appealed that decision to this court, but on the Board's motion we ordered the case remanded so that the Board could conduct a hearing.
[3] The Board pointed to a Supplementary Neurosurgical Report dated April 3, 1986, by Dr. Hustead, who had treated petitioner since 1984, stating that petitioner "should continue on a limited duty status avoiding bending and lifting as much as possible." Similarly, in late 1985 the Board of Police and Fire Surgeons, after reviewing the IAD videotape and considering Dr. Gunther's report, concluded that petitioner was able to perform a full tour of limited duty. At the hearing before the Board, Dr. Manning, a member of the BOS, reaffirmed his earlier opinion that petitioner could perform useful and efficient service in a limited duty status.

Petitioner argues that Dr. Manning's opinion is entitled to no weight since it was based heavily upon his review of the IAD videotape, and he conceded at the hearing that he had viewed a tape of another officer, not petitioner. Unlike petitioner, we do not find the record conclusive that Dr. Manning viewed the wrong tape, and hence we may not disregard the Board's reliance on his testimony and opinion. We also reject petitioner's argument that the Board gave too much weight to unreliable hearsay evidence, specifically the adverse action panel's report and findings, and the underlying medical documentation of petitioner's condition. See Martin v. District of Columbia Police & Firefighters' Retirement & Relief Bd., 532 A.2d 102, 109 (D.C. 1987); D.C.Code § 1-1509(b) (hearsay generally admissible unless "irrelevant, immaterial, [or] unduly repetitious"). Finally, we reject petitioner's claim that the Board could not rely upon the IAD videotape because it was not authenticated. Although the IAD officer who testified at the hearing had no personal knowledge of the tape, the Board had before it the IAD report which contained a thorough summary of the tape's contents.
[4] As suggested above, a finding of malingering in 1985 would not, by itself, prove that petitioner was feigning the degree of his disability in the period immediately before his termination, but it clearly would be relevant to that issue.